UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Kameron E. Boudin, | Case No. _____ |
| Plaintiff, | |
| | **COMPLAINT** |
| v. | |
| | JURY TRIAL DEMANDED |
| Jeremias "J.J." Krupich, acting in his individual | UNDER FED. R. CIV. P. 38(b) |
| capacity as an Otter Tail County Deputy, and | |
| Otter Tail County, | |
| Defendants. | |

---

For his Complaint, Plaintiff Kameron E. Boudin ("Boudin") hereby states and alleges as follows:

1.    This is an action for money damages and nonmonetary relief, in the form of discipline and training, for injuries sustained by Boudin as a result of the use of excessive force and violation of his well-settled federal civil rights by Defendant Jeremias "J.J." Krupich ("Krupich").

2.    This cause of action arises purely out of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution. State law claims and, by consequence, the limitations and defenses under state law are not applicable to this civil-rights lawsuit.

3.    Boudin was, at all times material herein, a citizen of the United States and a resident of the State of Minnesota.

4.    Boudin is a disabled Marine combat veteran who served multiple tours in Iraq and Afghanistan.

5.      Upon information and belief, Defendant Krupich was, at all times material herein, a duly appointed and acting deputy of the Otter Tail County Sheriff's Office.  He is sued in his individual capacity for misconduct occurring under color of state law.

6.      Defendant Krupich has since been terminated from his position as a Deputy with Otter Tail County.

7.      Defendant Otter Tail County is a "public corporation," suable under Minn. Stat. § 373.01, subd. 1(a)(1).  Otter Tail County is, and at all times material herein was, a political entity charged with control and supervision of all deputies of the Otter Tail County Sheriff's Office.

8.      Boudin brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this matter.

9.      At approximately 9:46 p.m. on December 13, 2018, there was a 911 call for service regarding a fight at The Doghouse Bar ("the bar") located at 123 E. Soo Street, Parkers Prairie, Minnesota.

10.     Parkers Prairie Police Department officer Paul Weltin ("Weltin") was the first officer to arrive at the bar.

11.     Shortly after Weltin's arrival, Boudin left the bar on foot.

12.     Numerous other officers from different agencies responded to the bar, including Defendant Krupich, Douglas County Sheriff's Deputies Carla Doll ("Doll") and

2

Corey Sammons ("Sammons") and Henning Police Department officer Mike Helle ("Helle").

13.    The officers were equipped with their department issued gear, including guns and Tasers.

14.    The officers were informed that Boudin was involved in the altercation at the bar.

15.    All of the alleged "victims" remaining at the bar denied the need for any medical attention.

16.    Believing that Boudin had left the bar to go to his home located nearby at 323 South Douglas Avenue in Parker's Prairie, Defendant Krupich, along with Weltin, Doll and Sammons, drove the approximately .2 miles and attempted to locate Boudin.

17.    Defendant Krupich announced his intention to the assembled officers at the bar that "Runnings (sic) going to get you beat" and "If you're yanking away I'm going to beat you."

18.    None of the assembled officers disagreed or intervened.  Some laughed.

19.    Defendant Krupich and other officers were informed by Boudin's girlfriend, who also resided at 323 South Douglas Avenue, that Boudin was located in the front bedroom of their home.

20.    Otter Tail County Sergeant Robert Huckeby arrived at the scene as entry to the home was being made.

21.    Upon information and belief, Helle was also at the scene.

3

22.     Weltin and Defendant Krupich entered Boudin's home through the back entrance off the deck.

23.     Doll and Huckeby reportedly entered Boudin's home through the front entrance.

24.     Once inside Boudin's home, Weltin and Defendant Krupich walked to the bedroom on the northeast corner.

25.     Defendant Krupich entered the bedroom first.

26.     Weltin followed Defendant Krupich into the bedroom.

27.     Defendant Krupich reportedly had both his Taser and flashlight out as he entered the bedroom.

28.     Reportedly, Boudin was not initially visualized by Weltin or Defendant Krupich.

29.     Defendant Krupich removed a blanket from the foot of the bed and was able to see Boudin lying on the floor, partially under the bed.

30.     Eventually, Boudin provided one arm to Defendant Krupich.

31.     Defendant Krupich grabbed Boudin's arm and pulled him partially out from under the bed.

32.     Weltin illuminated the bedroom with his flashlight during Defendant Krupich's interaction with Boudin.

33.     Defendant Krupich then reportedly lifted the bed up and pulled Boudin out from under it.

34.     At or around this time, Sammons entered the bedroom.

4

35.    Upon information and belief, Sammons was the only law enforcement officer on the scene that was wearing a body worn camera ("BWC").

36.    As such, after Sammons entered the bedroom, portions of Defendant Krupich's interaction with Boudin were captured on his BWC video.

37.    Sammons entered the bedroom at approximately 04:31:05 as denoted from the BWC. The times from Sammons's BWC are in Zulu Time and are not reflective of the actual time of day in the time zone that the incidents occurred.

38.    When Sammons entered the bedroom, Krupich was to his left and bent over Boudin, with Weltin to the right.

39.    Shortly thereafter, Boudin stated: "ow, I'm trying to get out."

40.    At approximately 04:31:09, Sammons, Weltin and Krupich are visible inside the bedroom with Boudin laying supine on the floor.

41.    At approximately 04:31:15, Defendant Krupich sat on Boudin, straddling his torso, as Boudin was on the ground, still lying in a supine position.

42.    Due to both Boudin's position and Defendant Krupich's position on top of him, Boudin's movement was restricted.

43.    Further, Boudin was surrounded by law enforcement and confined to his bedroom.

44.    At approximately 04:31:18, on the BWC, Boudin stated clearly: "I can help you."

45.    This statement indicates to a reasonable officer that the subject has acceded to police authority.

5

46.     From approximately 04:31:18 to 04:31:21 on the BWC, Defendant Krupich directed Boudin to roll over onto his stomach while Defendant Krupich was still straddling Boudin, making it impossible for him to comply.

47.     Boudin replied logically and clearly: "I can't when you're holding me down...I can help you if you..."

48.     Defendant Krupich remained on top of Boudin's torso and/or hip area.

49.     Sammons also had a hold of Boudin intermittently.

50.     From approximately 04:31:26 to 04:31:32, two loud noises occur, while Boudin was partially obscured by Defendant Krupich.

51.     During that time, Defendant Krupich deliberately wound up and punched Boudin a number of times in the face and forehead, which were exposed by his supine position.

52.     Defendant Krupich struck Boudin with such force as to shatter Boudin's frontal sinuses and orbital walls.

53.     Sammons's BWC captured at least one of Defendant Krupich's punches as it landed on Boudin's face.

54.     Defendant Krupich made good on his prior statement to the officers by beating Boudin.

55.     Boudin never struck Defendant Krupich or any other officer during this incident.

56.     Boudin never threatened any officer at the scene.  Indeed, he repeatedly expressed his desire to aid the officers in their interaction with him.

6

57.     Defendant Krupich was not faced with an immediate threat of serious bodily harm or death to himself or others.

58.     Defendant Krupich faced only one subject, Boudin.

59.     Defendant Krupich had five other officers with him at Boudin's residence.

60.     Defendant Krupich and the other officers had a very significant advantage in physical positioning.

61.     Defendant Krupich and the other officers were also armed.

62.     Defendant Krupich had been or should have been trained in his 13 plus years of law enforcement not to use head strikes unless absolutely necessary and to avoid improper use of deadly force, including deadly force by head strikes.

63.     Immediately after the strikes by Defendant Krupich, Boudin began moaning and crying.

64.     Immediately after the strikes by Defendant Krupich, Boudin's ability to communicate was significant diminished.  He began mumbling and speaking incoherently, while continuing to express pain through both his words and tone of voice.

65.     From approximately 4:32:06 to 4:32:16, Boudin moaned: "I can help you.  It hurts. I can help you.  It hurts.  You hit me."

66.     Defendant Krupich admitted:  "I did hit you."

67.     Boudin continued moaning and repeatedly cried: "It hurts."

68.     At approximately 04:33:12, Boudin attempted to explain to the officers that he could not help them anymore because of the pain.  He also apologized as he struggled to his feet and was unable to walk on his own accord.

7

69.     Boudin's speech patterns remained negatively affected by the strikes from
Defendant Krupich and Boudin spoke of his pain using word-salad sentences, stating: "I'm
sorry, please, hurts…" and "please hurts" repeatedly as he was helped, barefoot through the
snow, to Weltin's squad car.

70.     The change in Boudin's speech illustrated his significant frontal lobe injuries
and is well-documented on Sammon's BWC.

71.     Sammons's vehicle was also equipped with a squad camera.

72.     While Sammons's squad camera did not capture the punches by Defendant
Krupich, it did capture Sammons's description of the incident mere minutes after it
occurred.

73.     At approximately 04:37:47 on the squad camera video, Sammons can be heard
making a phone call. The conversation proceeds as follows:

- **Sammons:**  What are you doing?
- **Unknown:**  Nothing, driving around.
- **Sammons:**  Holy shit, dude, Otter Tail does not fuck around, bro. (Laughs)
- **Unknown:**  Why?
- **Sammons:**  Dude, this kid starting resisting us, right? So, we're trying to flip
  him over. I mean pretty much fighting him on the fucking
  ground. So, he's lying on his back, won't roll over, and tenses
  his hands up, tenses his face up. This fucking Otter Tail County
  Deputy is on top of him and punches this dude in the face like
  six times as hard as he could.
- **Unknown:**  (Laughs) Oh, really?
- **Sammons:**  (Laughs) Yeah, so, I'm like no, what in the – why?
- **Unknown:**  (Laughs) Nice.

74.     No objectively reasonable officer would have delivered multiple, extremely
forceful head strikes to Boudin under these circumstances.

8

75.     Sammons' conversation in the recorded phone call depicts the force with which Defendant Krupich hit Boudin.

76.     Further, Sammons' recorded phone call conversation illustrates that Sammons was both surprised and gallingly amused by the use of force by Defendant Krupich, which severely and permanently injured Boudin's frontal lobe.

77.     Knowing that Boudin was injured, Weltin transported Boudin to Lake Region Healthcare in Fergus Falls ("Lake Region").

78.     At Lake Region, Weltin and Boudin were met by another Otter Tail Deputy, Chris Peterson, who helped remove Boudin from the squad and placed him in a wheelchair because he could not walk.

79.     Boudin presented to Lake Region with ecchymosis with abrasions and swelling of the forehead and left periorbital region. He also had dried blood in both nostrils, but was breathing fine.

80.     A CT of Boudin's head showed the following:

> Severely comminuted and mildly to moderately displaced and depressed fractures of the outer table of the frontal sinuses bilaterally. This fracture extends to the left superior orbital wall with predominantly left intraorbital soft tissue injury…Moderate soft tissue edema in the bilateral frontal regions. Moderate left periorbital edema and scattered gas in the left periorbital region. Gas and small hematoma extends to the superior aspect of the left orbit in the extraconal space.

81.     Due to the severity of his injuries, the on-call facial trauma surgeon at Sanford Medical Center in Fargo, North Dakota ("Sanford") was consulted and he recommended transport to his facility.

9

82.     Upon the recommendation, Boudin was transported from Lake Region to Sanford via ambulance.

83.     At Sanford, it was noted Boudin had superficial wounds to his knees and hands.

84.     However, it was due to his extensive facial trauma that he was admitted to the hospital on December 14, 2018.

85.     As Sanford, both the facial trauma and the on-call surgery teams were consulted regarding Boudin's injuries.

86.     Boudin's primary diagnosis upon arrival to Sanford included the following: 1) assault and 2) comminuted and depressed frontal bone fractures involving the orbital roof on each side.

87.     Boudin was further diagnosed with major depressive disorder and post-traumatic stress disorder while at Sanford.

88.     During Boudin's December 14, 2018 consultation with plastic and reconstructive surgery, Dr. Jimmy Chim noted the severity of Boudin's factures, which required surgical intervention.

89.     Below are images showing the severity of Boudin's injuries before he underwent surgery:

10





90308835.1



90.     On December 16, 2018, Boudin underwent surgery with Dr. Chim.

91.     The procedures performed by Dr. Chim included: 1) open bilateral frontal

sinus interrogation and sonograms; 2) open reduction and internal fixation of bilateral

frontal sinus fractures; 3) open reduction and internal fixation of left superior orbital rim and

roof fractures; and 4) closed reduction of nasal septal fracture.

92.     To start, a bicoronal incision was made across the top of Boudin's scalp.

93.     With hooked retraction, Dr. Chim entered into the subgaleal plane and

dissected the bicoronal flap forward.

94.     Once Dr. Chim reached the region approximately 3 to 4 centimeters from the

cephalad to the lateral brows, he incised the temporalis fascia bilaterally in order to protect

the frontal nerves and then extended the incision into the pericranium to create a pericranial flap.

95.    Next, the pericranial flap was elevated to expose the frontal bones of Boudin's head all the way down to his nasal bridge.

96.    Essentially, this involved peeling the front top of Boudin's head and face off to be able to repair these very severe fractures.

97.    Further dissection exposed Boudin's frontal sinus fractures and the fractures along the left superior orbital rim and roof.

98.    The operative note states that Boudin's "fractures were quite comminuted and complex involving the left supratrochlear neurovascular bundle."

99.    As such, the neurovascular bundle was identified, dissected off the fracture fragments and preserved.

100.   Portions of Boudin's superior orbital rim and roof were extracted from the fracture site in order to plan the fixation.

101.   An absorbable reduction plate was placed along Boudin's superior orbital roof "to reduce the extensive amount of periorbital fat herniating into the frontal sinus." In order to do so, Dr. Chim placed a custom cut plate beneath the orbital roof bonds and superior to the orbital contents.

102.   The remaining fragments of Boudin's superior orbital roof and rim were then fixated with mini titanium plates and self-tapping screws.

103.   Next, Dr. Chim debrided part of Boudin's frontal sinus bone, mucous and devitalized mucosa from both sinuses.

13

104.    Dr. Chim then piecemealed the large bony fragments of both frontal sinus anterior tables together and fixated them with a combination of linear, Y, H, X, box and grid plates with self-tapping 4 millimeter screws in order to reconstruct the contour of Boudin's forehead.

105.    Boudin's pericranial flap was then replaced over the reconstruction of his frontal lobe and sinuses. To do so, it was tacked to the residual pericranium with sutures. Then, Boudin's bilateral temporalis fascia incision was re-approximated with sutures.

106.    A drain was placed underneath the bicoronal flap exiting the right postauricular skin.

107.    Then, Boudin's bicoronal flap was reapproixmated and closed using deep interrupted sutures.

108.    A combination of sutures were placed over the top.

109.    Dr. Chim next addressed Boudin's bilateral nasal cavities.

110.    The fractured septum with septal deviation to the right constricting the right nasal airway was confirmed, but the bones were solid to palpation, leading Dr. Chim to believe the nasal fractures seen on the CT were "old and healed."

111.    Dr. Chim reduced the fracture and stabilized it with splints.

112.    In total, 27 screws and 7 plates were placed into Boudin's head.

113.    Below are images of Boudin's injuries post-surgical intervention, which show the hardware placed in his head:

14

90308835.1



114.     Below are photographs of Boudin after the surgical intervention.  The

photographs show the re-approximation of the portion of his head and face that were peeled

off in order to repair his fractures and the deformity of his forehead due to the injuries he

sustained on December 13, 2018 and the surgical intervention:





16

90308835.1



115.    During his admission to Sanford, Boudin had one rapid behavior health response that required the administration of Haldol, an antipsychotic, and led to a psychology consultation.

116.    Behavior and personality changes and outbursts are known sequelae of frontal lobe injuries.

117.    During his psychology consultation on December 18, 2018, Boudin endorsed the onset of nightmares after the December 13, 2018 altercation with police at his home.

118.    Further, during his admission at Sanford, Boudin noted that the recent trauma on December 13, 2018 had brought memories from his prior trauma to the surface. He explained that when he closes his eyes he sees bad things happening around him.

119.    The December 13, 2018 incident negatively impacted and exacerbated Boudin's mental health.

17

120.    After the surgical intervention and during his admission at Sanford, Boudin reported double vision, pain, swelling and photosensitivity.

121.    Further, Boudin demonstrated organic cognitive deficits with attention, reasoning and planning and it was noted he was now impulsive and also easily agitated and irritable with stimulation.

122.    Boudin was restricted from many activities upon his discharge from Sanford on December 19, 2018, including from working, driving and even blowing his nose.

123.    As such, Boudin would need 24/7 assistance with activities of daily living, in addition to outpatient occupational therapy to address visual perceptual deficits and high-level cognition issues – organic results of the frontal lobe injuries he sustained on December 13, 2018.

124.    Boudin remains limited in what he can physically and mentally handle due to the injuries he sustained on December 13, 2018.

125.    Boudin's pain from the injuries he sustained on December 13, 2018 continues and has been debilitating.

126.    Boudin's personality remains organically altered due to the severe frontal lobe injuries he sustained on December 13, 2018.

127.    Boudin's cognitive functioning and mental health were organically altered in a negative way by the December 13, 2018 incident.

128.    Boudin's eye and brain functioning have been negatively altered from the December 13, 2018 incident, requiring on-going therapy.

90308835.1

129.    Boudin remains permanently disfigured and scarred from the December 13, 2018 incident and required surgical intervention.

130.    Due to the extensive and severe injuries he sustained at the hands of Defendant Krupich, Boudin has been out of work since the date of the incident.

131.    Due to the extensive and severe injuries he sustained at the hands of Defendant Krupich, Boudin has been unable to drive since the date of the incident.

132.    Minn. Stat. § 466.07 requires indemnification of Defendant Krupich by Otter Tail County.

133.    As required under Minn. Stat. § 466.07(1), Defendant Krupich was acting in the performance of his duties as an Otter Tail County deputy on December 13, 2018 when he delivered the punches to Boudin's head.

134.    None of the exclusions in Minn. Stat. § 466.07(2) apply to Defendant Krupich's actions on December 13, 2018.

135.    In a December 21, 2018 letter to the Bureau of Criminal Apprehension ("BCA"), Otter Tail County Lt. Keith Van Dyke, on behalf of Otter Tail County Sheriff Brian Schlueter, requested the BCA's assistance in investigating the December 13, 2018 actions of Defendant Krupich.

136.    Within the letter, Van Dyke provided his synopsis of the December 13, 2018 events.

137.    Van Dyke's synopsis of the December 13, 2018 events was favorable to Defendant Krupich as it provided justification for his actions and explained away Sammons's description of Defendant Krupich's actions in the above-included phone call

19

(which he later "corrected"). Further, no comparison of Defendant Krupich's conduct and Otter Tail County polices, practices and training, or Minnesota law, was included by Van Dyke. Also omitted was any mention that Krupich had twice stated his intent to beat Boudin back at the bar prior to encountering him at his residence.

138.    Van Dyke's synopsis is an endorsement of Defendant Krupich's conduct and estops Otter Tail from asserting any excuse for indemnification.

139.    Despite Van Dyke's endorsement of Defendant Krupich, Otter Tail County subsequently terminated his employment.

140.    Van Dyke's letter provided an outline for the BCA to come to the usual, predetermined and preordained result and, therefore, Defendant Krupich was not charged as a result of the BCA's investigation.

141.    Yet, almost a year after the incident, Boudin was charged with two counts of fifth degree assault, one count of disorderly conduct and one count of fleeing a peace officer. All of these charges are misdemeanors. The timing shows they are retaliatory in nature.

## COUNT ONE

### 42 U.S.C. § 1983 – FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS
*Plaintiff Boudin v. Defendant Krupich*

142.    Boudin realleges and incorporates by reference herein each and every allegation contained in each above paragraph as though fully set forth herein.

20

143.    Defendant Krupich violated Boudin's Fourth and Fourteenth Amendment rights to be free from excessive force by punching him in the face multiple times on December 13, 2018.

144.    By the actions described above, Defendant Krupich, under the color of state law, deprived Boudin of his clearly established and well-settled rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

145.    Defendant Krupich subjected Boudin to this deprivation of rights either maliciously or with reckless disregard for whether his rights would be violated.

146.    As a direct and proximate result of the acts and omissions of Defendant Krupich, Boudin suffered severe and permanent injuries, was forced to endure severe pain and mental suffering, and was thereby damaged in an amount to be determined by a jury.

147.    Punitive damages are available against Defendant Krupich and are claimed as a matter of right under federal common law and *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

148.    Boudin is entitled to recovery of his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

## COUNT TWO

## 42 U.S.C. § 1983 – FAILURE TO TRAIN UNDER *CITY OF CANTON V. HARRIS*
### *Plaintiff Boudin v. Defendant Otter Tail County*

149.    Boudin realleges and incorporates by reference herein each and every allegation contained in each above paragraph as though fully set forth herein.

21

90308835.1

150.     Upon information and belief, before December 13, 2018, Otter Tail County intentionally, knowingly, recklessly or with deliberate indifference to the rights of citizens, failed to properly train Defendant Krupich in the constitutionally proper use of force.

151.     Absent proper training, continued monitoring and discipline of its deputies, including Defendant Krupich, it is foreseeable that instances of excessive force will occur.

152.     As a direct and proximate result of the acts and omissions by Otter Tail County, Boudin suffered severe and permanent injuries, was forced to endure great pain and mental suffering, and was damaged in an amount to be determined by a jury.

153.     Boudin is entitled to fully recover his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

WHEREFORE, Plaintiff prays for a judgment against Defendants as follows:

1.     That this Court find that Defendants Krupich and Otter Tail County committed acts and omissions violating the United States Constitution, actionable under 42 U.S.C. § 1983;

2.     As to Count One, a money judgment against Defendant Krupich for compensatory and punitive damages in an amount to be determined by a jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988, and prejudgment interest;

3.     As to Count Two, a money judgment against Otter Tail County for compensatory damages in an amount to be determined by a jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988, and prejudgment interest;

22

4.     For an order mandating changes in the training, policies and procedures of the

Otter Tail County Sheriff's Department requiring, among other things, discipline for the use

of such excessive force executed by Defendant Krupich on December 13, 2018; and

5.     For such other and further relief as this Court may deem just and equitable.


                                             ROBINS KAPLAN, LLP

Date:   2/10/20                              Robert Bennett, #6713
                                             Andrew J. Noel, #322118
                                             Kathryn H. Bennett, #0392087
                                             Marc E. Betinsky, #0388414
                                             800 LaSalle Ave, Suite 2800
                                             Minneapolis, MN 55402
                                             Telephone: 612-349-8500
                                             rbennett@robinskaplan.com
                                             anoel@robinskaplan.com
                                             kbennett@robinskaplan.com
                                             mbetinsky@robinskaplan.com

23

90308835.1